UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| CNS INTERNATIONAL MINISTRIES, INC., a Missouri Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | ) ) ) | |
| KATHLEEN SEBELIUS, in her official capacity as the Secretary of the United States Department of Health and Human Services, | ) ) ) ) ) | |
| UNITED STATES DEPARTMENT OF THE TREASURY, | ) ) ) | |
| TIMOTHY F. GEITHNER, in his official capacity as the Secretary of the United States Department of the Treasury, | ) ) ) ) | |
| UNITED STATES DEPARTMENT OF LABOR, and | ) ) ) | |
| HILDA L. SOLIS, in her official capacity as Secretary of the United States Department of Labor, | ) ) ) ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiff CNS International Ministries, Inc., for its Complaint, states:

**NATURE OF THE ACTION**

1.      This case challenges regulations issued under the Patient Protection and

Affordable Care Act of 2010 ("Affordable Care Act") that force the Plaintiff to either (a) violate

its sincerely-held religious opposition to abortion on demand or (b) pay heavy fines and penalties.

2.     CNS International Ministries, Inc. ("CNS Ministries") provides full-time residential services to men and women who suffer from alcohol or drug dependencies and behavioral problems.  CNS Ministries, a Missouri non-profit corporation, strives to address its needs from a Christian perspective.  CNS Ministries employs more than 50 men and women. CNS Ministries, along with its founder and board chairman Charles N. Sharpe, opposes elective or non-therapeutic abortion ("abortion on demand") as a matter of sincere religious belief and practice.  CNS Ministries, as a benefit of employment, provides health insurance to its employees through a self-insured program.

3.     The Plaintiff's sincerely held religious beliefs forbid it from participating in, paying for, sharing the costs of, training others to engage in, or otherwise supporting or providing a means of abortion on demand.

4.     The Plaintiff does not believe that abortion on demand constitutes medicine, health care, or a means of providing for the well-being of persons.  Rather, Plaintiff believes that abortion on demand involves gravely immoral practices and the intentional destruction of innocent human life.

5.     The Defendants have issued an administrative rule ("Mandate" or "Final Rule") pursuant to authority created by the Affordable Care Act requiring that group health plans cover, without cost sharing, "all Food and Drug Administration-approved contraceptive methods, sterilization procedures and patient education and counseling for all women with reproductive capacity" in plan years beginning as early as August 1, 2012.  Such contraceptive methods include certain drugs and devices such as the "Plan B" and "ella" pills and copper IUDs, all of which are

widely known as abortifacients in that they frequently function to destroy fertilized eggs, which Plaintiff considers to be abortion on demand.  This not only forces the Plaintiff to treat abortion on demand and related education and counseling as health care, but also subverts the expression of the Plaintiff's religious beliefs (which it shares with millions of other Americans), by forcing it to fund, promote, and assist and participate in the provision of the acquisition of drugs and services which it believes involve gravely immoral practices, including the intentional destruction of innocent human life.

6.     The Mandate unconstitutionally forces the Plaintiff to violate its sincerely held religious beliefs under threat of heavy fines and penalties.  The Mandate also forces the Plaintiff to fund government-dictated speech that is directly at odds with Plaintiff's own speech and religious teachings.  Having to pay a fine to government authorities for the privilege of practicing one's religion or controlling one's own speech is un-American, unprecedented, and flagrantly unconstitutional.

7.     The Defendants' refusal to accommodate conscience is selective.  A patchwork of exemptions shows that Defendants do not believe every insurance plan in the country needs to cover these services.  For instance, Defendants have issued thousands of waivers from the Affordable Care Act (in its entirety) for many large corporations and labor unions, purely for reasons of commercial or political convenience.  Other exemptions have been awarded based on how old a plan is, or how large an employer is.  There are several other exemptions from the Affordable Care Act and from the Mandate, for a variety of groups and for a variety of reasons, including exemptions for certain narrowly defined religious employers that have found favor with the Defendants.  There is, however, no exemption for religious employers like the Plaintiff.

3

8.     Defendants acted with full knowledge of the beliefs of thousands of employers like the Plaintiff, and because they arbitrarily exempt some plans for a wide range of reasons other than religious conviction, the Mandate can be interpreted as nothing other than callous disregard of the religious beliefs of the Plaintiff and many other Americans.  The Plaintiff accordingly seeks refuge in this Court.

## JURISDICTION AND VENUE

9.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, § 1343(a)(4), § 1346(a)(2), and § 1361.  This action arises under the Constitution and laws of the United States.  This Court has jurisdiction to render declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 2000bb-1.

10.     Venue lies in this district pursuant to 28 U.S.C. § 1391(e).

## THE PARTIES

11.     Plaintiff CNS Ministries is a non-profit Missouri corporation organized under section 501(c)(3) of the Internal Revenue Code and resides in Shelby County, Missouri.  Charles N. Sharpe is the founder, chairman of the board and chief executive officer of CNS Ministries.

12.     Defendants are appointed officials of the United States government and United States governmental agencies responsible for issuing the Mandate.

13.     Defendant Kathleen Sebelius is the Secretary of the United States Department of Health and Human Services ("HHS").  In this capacity, she has responsibility for the operation and management of HHS.  Sebelius is sued in her official capacity only.

14.     Defendant HHS is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Mandate.

15.     Defendant Hilda Solis is the Secretary of the United States Department of Labor.

4

In this capacity, she has responsibility for the operation and management of the Department of Labor.  Solis is sued in her official capacity only.

16.      Defendant Department of Labor is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Mandate.

17.      Defendant Timothy Geithner is the Secretary of the Department of the Treasury. In this capacity, he has responsibility for the operation and management of the Department of the Treasury.  Geithner is sued in his official capacity only.

18.      Defendant Department of Treasury is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Mandate.

## FACTUAL ALLEGATIONS

**I.      Plaintiff's Religious Beliefs and Practices Related to Abortion.**

19.      CNS Ministries was founded by Charles Sharpe in 1995.  Among its several functions is ministry to the spiritual, emotional, and material needs of men and women who suffer from drug and alcohol abuse or other problems.  The Plaintiff strives to address these issues through Christian education, vocational training, and work programs.  Its education programs stress both Christian doctrine and practice, including teaching that abortion for reasons other than to save the life of the mother is gravely immoral and is the intentional taking of an innocent human life.

20.      Christian belief and practice are integral to the identity and educational mission of the Plaintiff, and adherence to Christian tenets is deeply and sincerely integral to the Plaintiff.

21.     The Plaintiff seeks to defend and promote certain moral and ethical standards in its employees, including not just teaching them a life-sustaining work ethic but also promoting a belief in the sanctity and quality of life which precludes abortion on demand through abortifacient drugs and devices or otherwise.

22.     As part of its ministry, the Plaintiff promotes the well-being and health of its employees.  In furtherance of these commitments, the Plaintiff ensures that its employees have comprehensive medical coverage through a self-insured plan.  The plan purposely does not include coverage for abortions or abortifacient drugs or devices.

23.     The Plaintiff cannot provide, fund or in any way be a participant in the provision of health care coverage for abortions or abortifacient drugs and devices, or related education and counseling, without violating its deeply and sincerely held religious beliefs.

24.     The Plaintiff cannot provide, fund or in any way be a participant in the provision of information or guidance to others under the same insurance plan about locations at which they can access abortifacients, or related education and counseling, without violating its deeply and sincerely held religious beliefs.

25.     The Plaintiff's health insurance plan year begins on January 1, 2013.

## II.     Abortifacient Drugs

26.     "Plan B" (levonorgestrel) was approved by the Food and Drug Administration ("FDA") as a prescription-only drug product on July 28, 1999 and was approved by the FDA for over-the-counter sales on August 24, 2006 for women 18 years of age and older and by prescription for those 17 or younger.  It is to be taken within three days after unprotected sex.  On July 9, 2009, a more potent version, Plan B One Step, was approved by the FDA with the same restrictions.  Next Choice is another FDA-approved levonorgestrel

6

abortifacient.  *See* FDA Birth Control Guide, available at http://www.fda.gov/downloads/

ForConsumers/ByAudience/ForWomen/FreePublications/UCM282014.pdf (last visited

November 9, 2012).

27.     "ella" (ulipristal acetate) was approved by the FDA on August 13, 2010.  ella

is a prescription-only drug product which is taken within five days after a contraceptive

failure or unprotected sex.  *See* FDA Birth Control Guide, available at http://www.fda.gov/

downloads/ForConsumers/ByAudience/ForWomen/FreePublications/UCM282014.pdf (last

visited November 9, 2012).

28.     A copper IUD (intra-uterine devices) is an FDA-approved, T-shaped device

that is inserted into the uterus by a healthcare provider.  *See* FDA Birth Control Guide,

available at http://www.fda.gov/downloads/ForConsumers/ByAudience/ForWomen/

FreePublications/UCM282014.pdf (last visited November 9, 2012).

29.     Each of the aforementioned abortifacient drugs or devices frequently operates

by stopping a fertilized egg from being implanted into the uterus.

**III.    The Affordable Care Act**

30.     In March 2010, Congress passed and President Obama signed into law the Patient

Protection and Affordable Care Act, Pub. L. 111-148 (March 23, 2010), and the Health Care and

Education Reconciliation Act, Pub. L. 111-152 (March 30, 2010), collectively known as the

"Affordable Care Act."

31.     The Affordable Care Act ("Act") regulates the national health insurance market

by directly regulating "group health plans" and "health insurance issuers."

32.     The Act does not apply equally to all insurers, employers or individuals.

33.     The Act does not apply its fine and penalty provisions for failure to offer employer-sponsored insurance to employers with fewer than 50 employees, not counting seasonal workers.  26 U.S.C. § 4980H(c)(2)(A).

34.     The Act is not generally applicable because it provides for numerous exemptions from its rules.

35.     The Act's preventive care requirements do not apply to employers who provide so-called "grandfathered" health care plans.  Given plan changes since March 23, 2010, the Plaintiff's health insurance plan does not qualify as a grandfathered health plan.  *See* 42 U.S.C. § 18011(a)(2); 26 C.F.R. § 54.9815-1251T; 29 C.F.R. § 2590.715-1251; 45 C.F.R. § 147.140.

36.     Employers who follow HHS guidelines may continue to use grandfathered plans indefinitely.

37.     HHS has predicted that a majority of large employers, employing more than 50 million Americans, will continue to use grandfathered plans through at least 2014, and that a third of small employers with between 50 and 100 employees may do likewise. *Se*e Keeping the Health Plan You Have: The Affordable Care Act and "Grandfathered" Health Plans, available at http://www.healthcare.gov/news/factsheets/2010/06/keeping-the-health-plan-you-havegrandfathered. html (last visited November 9, 2012).

38.     According to government estimates, a total of 191 million Americans belong to plans which may be grandfathered under the Act.  Interim Final Rules for Group Health Plans and Health Insurance Coverage Relating to Status as a Grandfathered Health Plan Under the Patient Protection and Affordable Care Act, 75 Fed. Reg. 34538, 34540 (June 17, 2010).

39.     In addition to grandfathering under the Act, the preventive care guidelines exempt certain religious employers (as more fully described *infra*) from any requirement to cover contraceptive services.  45 C.F.R. § 147.130(a)(iv)(B).

40.     The Act is not neutral because some groups, both secular and religious, enjoy exemptions from the law, while certain religious groups do not.

41.     None of the several exemptions from the law applies to the Plaintiff.

42.     Certain provisions of the Act do not apply equally to members of certain religious groups.  *See, e.g.,* 26 U.S.C. § 5000A(d)(2)(a)(i) and (ii) (individual mandate does not apply to members of a "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds); 26 U.S.C. § 5000A(d)(2)(b)(ii) (individual mandate does not apply to members of a "health care sharing ministry" that meets certain criteria).

43.     The Department of Health and Human Services has the authority under the Act to grant compliance waivers ("HHS waivers") to employers and other health insurance plan issuers.  HHS waivers release employers and other plan issuers from complying with the provisions of the Act.  HHS decides whether to grant waivers based on individualized waiver requests from particular employers and other health insurance plan issuers.  Upon information and belief, more than a thousand HHS waivers have been granted.  The Act is not neutral because some religious groups have received HHS waivers while other religious groups have not.

44.     The Act is not generally applicable because Defendants have granted numerous waivers from complying with the Act's requirements.

45.     The Act is not generally applicable because it does not apply equally to all individuals and plan issuers.

46.     Defendants' waiver practices create a system of individualized assessments to qualify for an exemption.

47.     Violations of the Act can subject an employer and an insurer to substantial monetary penalties.

48.     Under the Internal Revenue Code, certain employers who fail to offer "full-time employees (and their dependents) the opportunity to enroll in minimum essential coverage under an eligible employer-sponsored plan" will be exposed to significant annual fines of $2,000 per full-time employee.  *See* 26 U.S.C. § 4980H(a), (c)(1).

49.     Additionally, under the Internal Revenue Code, group health plans that fail to provide certain required coverage may be subject to an assessment of $100 a day per individual.  *See* 26 U.S.C. § 4980D(b); *see also* Jennifer Staman & Jon Shimabukuro, Cong. Research Serv., RL 7-5700, Enforcement of the Preventative Health Care Services Requirements of the Patient Protection and Affordable Care Act (2012) (asserting that this penalty applies to employers who violate the preventive care provision of the Act).

50.     Under the Public Health Service Act, the Secretary of HHS may impose a monetary penalty of $100 a day per individual where an insurer fails to provide the coverage required by the U.S. Government Mandate.  *See* 42 U.S.C. § 300gg-22(b)(2)(C)(i); *see also* Cong. Research Serv., RL 7-5700 (asserting that this penalty applies to insurers who violate the preventive care provision of the Act).

51.     ERISA may provide for additional penalties.  Under ERISA, plan participants can bring civil actions against insurers for unpaid benefits.  29 U.S.C. § 1132(a)(1)(B); *see also* Cong. Research Serv., RL 7-5700.  Similarly, the Secretary of Labor may bring an enforcement action against group health plans of employers that violate the U.S. Government Mandate, as incorporated

by ERISA.  *See* 29 U.S.C. § 1132(b)(3); *see also* Cong. Research Serv., RL 7-5700 (asserting that these penalties can apply to employers and insurers who violate the preventive care provision of the Act).

## IV.   The Preventive Care Mandate

52.     The Affordable Care Act mandates that health plans "provide coverage for and shall not impose any cost sharing requirements for[,] . . . with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration," and directs the Secretary of HHS to determine what would constitute "preventive care" under the mandate. 42 U.S.C. § 300gg—l3(a)(4).

53.     On July 19, 2010, HHS, along with the Department of Treasury and the Department of Labor, published an interim final rule under the Affordable Care Act. 75 Fed. Reg. 41726 (2010).  The interim final rule requires providers of group health insurance to cover preventive care for women as provided in guidelines to be published by the Health Resources and Services Administration at a later date.  75 Fed. Reg. 41759 (2010).

54.     A number of groups filed comments warning of the potential conscience implications of requiring religious individuals and groups to pay for certain kinds of "health care," including abortion on demand and abortifacients.

55.     HHS directed an independent, non-profit private health policy organization, the Institute of Medicine ("IOM"), to suggest a list of recommended guidelines describing which drugs, procedures, and services should be covered by all health plans as preventive care for women.  See Women's Preventive Services: Required Health Plan Coverage Guidelines, http://www.hrsa.gov/womensguidelines (last visited November 9, 2012).

56.     In developing its guidelines, the IOM invited a select number of groups to make presentations on the preventive care that should be mandated by all health plans.  These were the Guttmacher Institute, the American Congress of Obstetricians and Gynecologists, John Santelli, the National Women's Law Center, National Women's Health Network, Planned Parenthood Federation of America, and Sara Rosenbaum.

57.     No religious groups or other groups that oppose government-mandated coverage of abortion and related education and counseling were among the invited presenters.

58.     One year after the first interim final rule was published, on July 19, 2011, the IOM published its recommendations. It recommended that the preventive services include sterilization procedures and "All Food and Drug Administration approved contraceptive methods [and] sterilization procedures."  Institute of Medicine, Clinical Preventive Services for Women: Closing the Gaps (July 19, 2011).

59.     FDA-approved "contraceptive" methods include birth-control pills; prescription contraceptive devices, including IUDs; Plan B, also known as the "morning-after pill"; ulipristal, also known as "ella" or the "week-after pill"; and other drugs, devices, and procedures.  See FDA Birth Control Guide, available at http://www.fda.gov/downloads/ForConsumers/ ByAudience/ForWomen/FreePublications/UCM282014.pdf (last visited November 9, 2012).

60.     Thirteen days later, on August 1, 2011, without notice of rulemaking or opportunity for public comment, HHS, the Department of Labor, and the Department of Treasury adopted the IOM recommendations in full and promulgated an interim final rule ("the Mandate"), which requires that all "group health plan[s] and . . . health insurance issuer[s] offering group or individual health insurance coverage" provide all FDA-approved contraceptive methods and sterilization procedures.

76 Fed. Reg. 46621 (published Aug. 3, 2011); 45 C.F.R. § 147.130. On the same day the Health Services and Resources Administration issued guidelines adopting the IOM recommendations. See Women's Preventive Services: Required Health Plan Coverage Guidelines, http://www.hrsa.gov/womensguidelines (last visited November 9, 2012).

61. The Mandate also requires group health care plans and issuers to provide education and counseling, including on the subject of abortifacients, for all women beneficiaries with reproductive capacity.

62. The Mandate went into effect immediately as an "interim final rule."

63. HHS did not adequately accommodate the concerns of religious organizations in the comments submitted before the Mandate was issued. The Mandate was unresponsive to the concerns stated in the comments submitted by religious organizations.

64. When it issued the Mandate, HHS requested comments from the public by September 30, 2011, and indicated that comments would be available online. Upon information and belief, over 100,000 comments were submitted against the Mandate.

65. On October 5, 2011, six days after the comment period ended, Defendant Sebelius gave a speech at a fundraiser for NARAL (National Abortion Rights Action League) Pro-Choice America. She told the assembled crowd that "we are in a war."

66. The Mandate fails to take into account the statutory and constitutional conscience rights of religious organizations like the Plaintiff.

67. The Mandate requires that the Plaintiff provide coverage for or otherwise participate in the provision of abortifacients and related education and counseling against Plaintiff's religiously informed consciences.

68. The Mandate constitutes government-imposed pressure and coercion on

the Plaintiff to change or violate its religious beliefs and practices.

69.     The Mandate exposes the Plaintiff to substantial fines because of Plaintiff's refusal to change or violate its religious beliefs and practices.

70.     The Mandate forces the Plaintiff to provide, fund or participate in the provision of abortifacients and related education and counseling in violation of its religious beliefs, conduct which is equivalent to assisting another to intentionally destroy innocent human life.

71.     The Plaintiff believes that abortifacients such as Plan B, ella and copper IUDs can and do prevent the implantation of a human embryo in the wall of the uterus, and therefore can and do cause the death of the embryo, which is a human life.

72.     Plan B, ella and copper IUDs can and do prevent the implantation of a human embryo in the wall of the uterus.  Plan B, ella and copper IUDs can and do cause the death of the embryo.  The use of artificial means to prevent the implantation of a human embryo in the wall of the uterus constitutes an "abortion" as that term is used in federal law and as that term is understood by Plaintiff.  The use of artificial means to cause the death of a human embryo constitutes an "abortion" as that term is used in federal law and as that term is understood by Plaintiff.

73.     The Mandate forces the Plaintiff to provide, fund or to participate in the provision of abortifacients such as Plan B, ella and copper IUDs, free of charge, regardless of the ability of employees to obtain these drugs from other sources.

74.     The Mandate forces the Plaintiff to fund or to otherwise participate in the provision of education and counseling concerning abortion that directly conflicts with the Plaintiff's religious beliefs and teachings.

75.     The Plaintiff could not terminate its employees from health insurance coverage without violating its religious duty to provide for the health and well-being of its employees, and

14

would be hampered in its ability to hire and retain qualified employees if it were unable to provide health insurance.

76.     The Mandate forces the Plaintiff to choose among violating its religious beliefs, incurring substantial fines, or terminating its employee health care plans.

77.     Providing or funding counseling and education about abortion directly undermines and subverts the explicit messages and speech of the Plaintiff.

## V.     The Narrow and Discretionary Religious Exemption

78.     The Mandate indicates that the Health Resources and Services Administration ("HRSA") "may" grant religious exemptions to certain religious employers.  45 C.F.R. § 147.130(a)(iv)(A).  The Mandate allows HRSA to grant exemptions for "religious employers" who "meet[ ] all of the following criteria: (1) The inculcation of religious values is the purpose of the organization. (2) The organization primarily employs persons who share the religious tenets of the organization. (3) The organization serves primarily persons who share the religious tenets of the organization. (4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended."  45 C.F.R. § 147.130(a)(iv)(B).

79.     The Mandate imposes no constraint on HRSA's discretion to grant exemptions to some, all, or none of the organizations meeting the Mandate's definition of "religious employers."

80.     HHS stated that it based the exemption on comments on the 2010 interim final rule.  76 Fed. Reg. 46621.

81.     Most religious organizations, including the Plaintiff, have more than one purpose. For most religious organizations, including the Plaintiff, the inculcation of religious values is only one purpose among others.  Many religious organizations, including the Plaintiff, employ many persons who do not share their religious beliefs and for religious reasons are intentional in serving

15

many persons who do not share their religious beliefs.

82.     On January 20, 2012, Defendant Sebelius announced that there would be no change to the narrow religious exemption.  She added that "[n]onprofit employers who, based on religious beliefs, do not currently provide contraceptive coverage in their insurance plan, will be provided an additional year, until August 1**,** 2013, to comply with the new law," on the condition that those employers certify that they qualify for the one-year extension.  At the same time, however, Sebelius announced that HHS "intend[s] to require employers that do not offer coverage of contraceptive services to provide notice to employees, which will also state that contraceptive services are available at sites such as community health centers, public clinics, and hospitals with income-based support." *See* Statement by U.S. Dep't of Health and Human Serv's Secretary Kathleen Sebelius, *available at* http://www.hhs.gov/news/press/2012pres/01/20120120a.html (last visited February 7, 2012).

83.     To qualify for that narrow exemption, religious organizations must submit to an invasive governmental inquiry.  Even if Plaintiff believed the exemption applied to it, requiring Plaintiff to submit to this government-conducted test to determine if Plaintiff is sufficiently religious is inappropriate and substantially burdens the Plaintiff's firmly held religious beliefs.

**VI.     The Mandate and the Religious Exemption Become Final, Without Change.**

84.     On February 10, 2012, President Obama held a press conference at which he announced an intention to initiate, at some unspecified future date, a separate rulemaking process that would work toward creating a different contraceptive services mandate.  This promised mandate would, the President stated, attempt to take into account the kinds of religious objections voiced against the original Mandate contained in the interim final rule.

85.     On that same day—February 10, 2012—the Defendants issued a "guidance bulletin" describing a "Temporary Enforcement Safe Harbor" ("Safe Harbor") from the Mandate.  The Safe

Harbor applies to "non-exempted, non-grandfathered group health plans established and maintained by non-profit organizations with religious objections to contraceptive coverage (and any health insurance coverage offered in connection with such plans)."  Under the Safe Harbor, the Defendants state that qualifying organizations will not be subject to enforcement of the Mandate "until the first plan year that begins on or after August 1, 2013," provided they meet certain criteria outlined in the guidance bulletin.

86.     Those Safe Harbor criteria require an organization to self-certify that: (1) it operates as a non-profit; (2) it has not, from February 10, 2012 onward, offered "contraceptive coverage . . . by the group health plan established or maintained by the organization, consistent with any applicable State law, because of the religious beliefs of the organization"; and (3) it has provided (for the first plan year beginning on or after August 1, 2012) a notice to plan participants stating that "[t]he organization that sponsors your group health plan has certified that it qualifies for a temporary enforcement safe harbor with respect to the Federal requirement to cover contraceptive services without cost sharing," and that "[d]uring this one-year period, coverage under your group health plan will not include coverage of contraceptive services."

87.     On February 15, 2012, the Defendants adopted the original Mandate contained in the interim final rule, without any changes, as final.  77 Fed. Reg. 8725, 8727.  The Defendants also adopted, without any changes, the original "religious employer" exemption.  *Id.*

88.     In summary, plaintiff CNS Ministries is not certain that it will, in the view of the Defendants, satisfy the Safe Harbor requirements.  CNS Ministries believes that it may be determined by Defendants to be subject to enforcement action under the Mandate by January 1, 2013.  In any event, CNS Ministries will be subject to enforcement action under the Mandate by January 1, 2014.

89.     An actual, justiciable controversy currently exists between Plaintiff and

17

Defendants.  Absent a declaration resolving this controversy and the validity of the Mandate, the Plaintiff is uncertain as to its rights and duties in planning, negotiating, and/or implementing its group health insurance plans, its hiring and retention programs, and its social, educational, and other programs and ministries.

90.     The Plaintiff has no adequate remedy at law regarding the wrongs committed by Defendants.  Further, Plaintiff has no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

91.     Absent injunctive and declaratory relief against the Mandate, the Plaintiff has endured and will continue to endure irreparable harm that outweighs any harm to the defendants.

92.     Plaintiff is likely to succeed on the merits of its claims.

93.     An injunction, as sought by the Plaintiff, would not adversely affect the public interest.

## CAUSES OF ACTION

## COUNT I

## Violation of the Religious Freedom Restoration Act

94.     The Plaintiff incorporates by reference all preceding paragraphs.

95.     The Plaintiff's sincerely held religious beliefs prohibit it from providing, funding or participating in the provision of coverage for abortions or abortifacients, or related education and counseling.  The Plaintiff's compliance with these beliefs is a religious exercise.

96.     The Mandate creates government-imposed coercive pressure on the Plaintiff to change or violate its religious beliefs.

97.     The Mandate exposes the Plaintiff to substantial fines and penalties for its religious exercise.

18

98.     The Mandate exposes the Plaintiff to substantial competitive disadvantages, in that it will no longer be permitted to offer health insurance to employees.

99.     The Mandate imposes a substantial burden on the Plaintiff's religious exercise, as to both belief and practice.

100.    The Government has no compelling governmental interest in requiring Plaintiff to comply with the Mandate.

101.    The Mandate is not narrowly tailored to achieve any compelling governmental interest in a way that is least restrictive to Plaintiff's rights.

102.    The Mandate and Defendants' threatened enforcement of the Mandate violate the Plaintiff's rights secured to it by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq.

103.    Absent injunctive and declaratory relief against the Defendants, the Plaintiff has been and will continue to be harmed.

## COUNT II
### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause

104.    The Plaintiff incorporates by reference all preceding paragraphs.

105.    The Plaintiff's sincerely held religious beliefs prohibit it from providing, funding or participating in the provision of coverage for abortion or abortifacients, or related education and counseling. The Plaintiff's compliance with these beliefs is a religious exercise.

106.    Neither the Act nor the Mandate is neutral.

107.    Neither the Act nor the Mandate is generally applicable.

108.    Defendants have created categorical exemptions and individualized assessment exemptions to the Mandate.

109.    The Mandate furthers no compelling governmental interest.

110.    The Mandate is not narrowly tailored to be the least restrictive means of furthering Defendants' stated interests.

111.    The Mandate creates government-imposed coercive pressure on the Plaintiff to change or violate its religious beliefs.

112.    The Mandate chills the Plaintiff's religious exercise.

113.    The Mandate exposes the Plaintiff to substantial fines for its religious exercise or forces it to forfeit its right to employee health insurance.

114.    The Mandate exposes the Plaintiff to substantial competitive disadvantages, in that it will no longer be permitted to offer health insurance to employees.

115.    The Mandate imposes a substantial burden on the Plaintiff's religious exercise, as to both belief and practice.

116.    The Mandate is not narrowly tailored to achieve any compelling governmental interest.

117.    Despite being informed in detail of the fact that millions of Americans had beliefs in line with the Plaintiff's, Defendants designed the Mandate and the religious exemption to the Mandate in a way that made it impossible for the Plaintiff to comply with its religious beliefs.

118.    Defendants promulgated both the Mandate and the religious exemption to the Mandate in order to suppress the religious exercise of the Plaintiff and others.

119.    The Mandate and Defendants' threatened enforcement of the Mandate violate the Plaintiff's rights secured to it by the Free Exercise Clause of the First Amendment to the United States Constitution.

120.     Absent injunctive and declaratory relief against the Mandate, the Plaintiff has been and will continue to be harmed.

## COUNT III
### Violation of the First Amendment to the United States Constitution
### Establishment Clause

121.     The Plaintiff incorporates by reference all preceding paragraphs.

122.     By design, Defendants imposed the Mandate on some religious organizations but not on others, resulting in discrimination among religions and in a selective burden on the Plaintiff.

123.     The Mandate vests the HRSA with unbridled discretion in deciding whether to allow exemptions to some, all, or no organizations meeting the definition of "religious employers."

124.     The Mandate and Defendants' threatened enforcement of the Mandate thus violate the Plaintiff's rights secured to it by the Establishment Clause of the First Amendment of the United States Constitution.

125.     Absent injunctive and declaratory relief against the Mandate, the Plaintiff has been and will continue to be harmed.

## COUNT IV
### Violation of the First Amendment to the United States Constitution
### Freedom of Speech
### *Compelled Speech*

126.     The Plaintiff incorporates by reference all preceding paragraphs.

127.     The Plaintiff teaches and/or believes that abortion on demand violates its religious beliefs.

128.     The Mandate would compel the Plaintiff to subsidize and participate in activities that it teaches are violations of its religious beliefs.

129.    The Mandate would compel the Plaintiff to provide, fund or participate in the provision of abortifacients and education and counseling related to abortion.

130.    Expenditures are a form of speech protected by the First Amendment.

131.    Defendants' actions thus violate the Plaintiff's rights to be free from compelled speech as secured to it by the First Amendment of the United States Constitution.

132.    The Mandate's compelled speech requirement is not narrowly tailored to achieve a compelling governmental interest in a way least restrictive to Plaintiff's rights.

133.    Absent injunctive and declaratory relief against the Mandate, the Plaintiff has been and will continue to be harmed.

**COUNT V**
**Violation of the First Amendment to the United States Constitution**
**Freedom of Speech**
*Expressive Association*

134.    The Plaintiff incorporates by reference all preceding paragraphs.

135.    The Plaintiff teaches and/or believes that abortion on demand violates its religious beliefs.

135.    The Mandate would compel the Plaintiff to subsidize, fund or participate in the subsidization of activities that it teaches are violations of its religious beliefs.

136.    The Mandate would compel the Plaintiff to provide, fund or participate in the provision of abortifacients and education and counseling related to abortion.

137.    Defendants' actions thus violate the Plaintiff's right of expressive association as secured to it by the First Amendment of the United States Constitution.

138.    Absent injunctive and declaratory relief against the Mandate, the Plaintiff has been and will continue to be harmed.

**COUNT VI**
**Violation of the First and Fifth Amendments to the United States Constitution**
**Free Exercise Clause, Freedom of Speech and Due Process**
*Unbridled Discretion*

139.    The Plaintiff incorporates by reference all preceding paragraphs.

140.    By stating that the HRSA "may" grant an exemption to certain religious groups, the Mandate vests the HRSA with unbridled discretion over which organizations can have their First Amendment interests accommodated.

141.    The Mandate vests the HRSA with unbridled discretion to determine whether a religious organization such as the Plaintiff "primarily" serves and employs members of the same faith as the organization.

142.    Defendants' actions therefore violate the Plaintiff's rights not to be subjected to a system of unbridled discretion when engaging in speech or when engaging in religious exercise, as secured to it by the First Amendment and the due process requirements of the Fifth Amendment of the United States Constitution.

143.    Absent injunctive and declaratory relief against the Mandate, the Plaintiff has been and will continue to be harmed.

**COUNT VII**
**Violation of the Administrative Procedure Act**

144.    The Plaintiff incorporates by reference all preceding paragraphs.

145.    The Mandate is contrary to § 1303(b)(1)(A) of the Affordable Care Act, which provides that "nothing in this title" . . . "shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year." The Act also leaves it to "the issuer of a qualified health plan," not the Government, "[to] determine whether or not the plan provides coverage of [abortion]." 42 U.S.C. § 18023(b)(1)(A)(ii).

146.     The Defendants, in promulgating the Mandate, failed to consider the constitutional and statutory implications of the Mandate on organizations and individuals like the Plaintiff.

147.     The Mandate is contrary to existing law and is in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

148.     Absent injunctive and declaratory relief against the Mandate, the Plaintiff has been and will continue to be harmed.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court:

a.      Declare that the Mandate and Defendants' enforcement of the Mandate against the Plaintiff violate the First Amendment to the United States Constitution;

b.      Declare that the Mandate and Defendants' enforcement of the Mandate against the Plaintiff violate the Fifth Amendment to the United States Constitution;

c.      Declare that the Mandate and Defendants' enforcement of the Mandate against the Plaintiff violate the Religious Freedom Restoration Act;

d.      Declare that the Mandate and Defendants' enforcement of the Mandate against the Plaintiff violate the Administrative Procedure Act;

e.      Issue an order prohibiting Defendants from enforcing the Mandate against Plaintiff insofar as it requires it to provide, fund or participate in the provision of abortions or abortifacients, including Plan B, ella and copper IUDs, or related education and counseling;

f.      Award Plaintiff the costs of this action and reasonable attorney's and expert's fees pursuant to 42 U.S.C. § 1988 or as otherwise provided by law; and

g.      Award such other and further relief as it deems just and necessary.

OTTSEN, LEGGAT AND BELZ, L.C.


By:   /s/ Timothy Belz
      Timothy Belz    #MO-31808
      112 South Hanley, Second Floor
      St. Louis, Missouri 63105-3418
      Phone: (314) 726-2800
      Facsimile: (314) 863-3821
      tbelz@omlblaw.com

      Attorney for Plaintiff
      CNS International Ministries, Inc.